# EXHIBIT E



CERTIFIED COPY

MILLER & HELGESON
REPORTERS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

SCOTT BURSESE,

Plaintiff,

vs. No. CGC-06-448722

PAYPAL, INC., a Delaware corporation,

Defendant.

-----------------------------------

DEPOSITION OF: PAUL MONTGOMERY

TAKEN ON: November 10, 2006

NO. 11727

REPORTED BY: DAINE FREEMAN
CSR No. 5884

Los Angeles San Francisco
800.487.6278

DEPOSITION OF PAUL MONTGOMERY, taken on behalf of the Plaintiff at Two Shaw Alley, Third Floor, San Francisco, California, commencing at 1:40 P.M., ON FRIDAY, NOVEMBER 10, 2006, before DIANE L. FREEMAN, a Certified Shorthand Reporter, License No. 5884

APPEARANCES OF COUNSEL:

For the Plaintiff:

GONZALEZ & LEIGH, LLP
BY: G. WHITNEY LEIGH, Attorney at Law
Two Shaw Alley, Third Floor
San Francisco, California 94105
Phone: (415) 512-2000

For the Defendants:

ORRICK, HERRINGTON & SUTCLIFFE LLP
BY: GEORGE A. YUHAS, Attorney at Law
CHRISTIAN BROWN, Attorney at Law
405 Howard Street
San Francisco, California 94105
Phone: (415) 773-5446

A. Two years.

Q. Did you receive an associate's degree or bachelor's degree?

A. No.

Q. Have you had any other post secondary or secondary education?

A. I've gone -- took classes at DeAnza in photography, that sort of thing. Nothing for, you know, a degree of any sort.

Q. I want to go over your employment history. You have been employed I guess sometime in the '70s; is that correct?

A. '75.

Q. What was the first job you had?

A. It was called Computer Graphics. I think. No. That was before that. That was like '73.

MR. YUHAS: You might want to try not talking to yourself, it's hard for the court reporter.

THE WITNESS: Sorry.

MR. LEIGH: Q. What was your position at Computer Graphics?

A. Graphic -- I forget the title actually, but we basically digitized maps for Southwestern Bell.

Q. How long were you employed there?

A. About two years, I think. Until '75 when I

moved out here.

Q. Was Computer Graphics in Colorado?

A. Yeah, Denver.

Q. You moved out to California in 1975?

A. Right.

Q. What employment did you first take in California?

A. Working for a company called -- I did some job shopping at various companies. Got a three-month contract or something like that.

Q. Did you take a full-time employment job at some point?

A. Yes. I went full-time for a company called Calma.

Q. Calma?

A. C-a-l-m-a.

Q. Where was that located?

A. Sunnyvale.

Q. What did Calma do?

A. They made digitizers, you know, CAD instruments and things like that, computer aided design. Sorry.

Q. Do you recall the first title or position you held at Calma?

A. I was a trainer.

Q. As a trainer, what were your responsibilities?
A. To train customers about how to operate and program this equipment that Calma sold.
Q. For how long did you work at Calma?
A. Four years.
Q. Did your position at Calma change?
A. Yeah. I ended up being a senior analyst.
Q. What were your responsibilities as a senior analyst?
A. To consult with other companies on how to program these CAD systems so they could customize them to their own use.
Q. At some point did you leave Calma?
A. Yes. I worked for Intel.
Q. Was this around 1979 or 1980?
A. 1979, I think. It's been quite a while ago.
Q. I understand these are going to be approximations of the time.
A. Yeah.
Q. Do you recall what your first position was at Intel?
A. Senior programmer analyst.
Q. What were your responsibilities as a senior programmer analyst?
A. To program Intel's CAD system, to customize it

specifically for their use.

Q. When you say CAD, what does that acronym stand for?

A. Computer aided design.

Q. Just going back to your educational history. You got a degree. Your original degree -- you didn't obtain a degree, but did you study, while you were at the University of Colorado, did you have an emphasis or a focus in your studies?

A. Photography.

Q. Did you receive any training in Computer Graphics prior to or -- let me rephrase the question.

Did you receive any training or did you study -- did you -- while you were at the University of Colorado, did you take any courses relating to computers?

A. No. I was trained on the job basically wherever I went.

Q. So you received some on-the-job training at Computer Graphics; is that right?

A. Right.

Q. What was that training?

A. How to digitize maps and plot them on paper and backup software, so forth.

Q. Did you receive training at Calma?

A. Yes.

Q. How would you describe that training?

A. They trained -- they basically trained me how to train other people to use the system. But, then, as I got further along, more familiar with the system, then I started training people how to program those systems. Just basically at that time these were specialty systems and there was no way to actually put this in a class.

Q. Your first position at Intel, that was as a senior program analyst; is that correct?

A. Uh-huh.

Q. Prior to working at Intel, how would you describe the training you received that qualified you to take that position?

A. The training that I had at Calma. The expertise that I gained there, basically.

Q. Can you describe that a little more specifically?

A. When a company -- at that time a company had this huge system with a lot of software and a lot of hardware, and they had a basic set of software to drive those, to get it to work efficiently, someone had to actually program this -- these computers on how to read different outputs, like computer machining, drilling,

and so forth. That's what I do.

Q. For how long after 1979 did you work for Intel?

A. Let's see.

Q. Approximately.

A. Yeah, I'm still trying to think where I went next. I went to Tricad. That was about 1980.

Q. So you worked for Intel about a year; is that correct?

A. Yeah, it was more than a year. Might have been about '82 that I went to Tricad. I'd say maybe '82. It was two years I worked at Intel.

Q. Do you happen to have a resume?

A. Not with me. No.

Q. In your possession?

A. I think I have one in my system somewhere.

MR. LEIGH: Excuse me just for one moment.

(An off-the-record discussion was held.)

THE WITNESS: Probably be best, would save a lot of time if you got a copy of the resume. Answers both of the questions.

MR. LEIGH: Q. I'm going to try to move quickly through it, that's a problem, we don't have your resume here. I guess it's possible we could cut forward to your current status or the last couple of years. If we

have a continued deposition, if that occurs, we can talk about that in more detail. That's not a bad idea.

A. If it would help any, I have a system, senior manager or director or manager of automation systems using Segue for the last 10 or 12 years.

Q. Let me ask you this, you were familiar with the company PayPal?

A. Uh-huh.

Q. Are you currently employed by PayPal?

A. I am currently on disability.

Q. When were you first hired by PayPal?

A. June 2003.

Q. What company did you work for immediately prior to that?

A. Reuters.

Q. Reuters?

A. Reuters, yeah.

Q. Was that in San Jose?

A. That was in Palo Alto.

Q. What was your position for Reuters?

A. I was a senior programmer analyst. Sorry, I was a manager of automation. Sorry.

Q. Manager of automation?

A. Manager of automation.

Q. You indicated you joined PayPal in June 2003,

Q. Staff meetings?
A. Staff meetings.
Q. Did Sandy hold regular staff meetings?
A. Pretty much so, yes. As much as possible it would be weekly.
Q. Weekly?
A. Yeah.
Q. Okay. Who would regularly attend these meetings?
A. There were Brian Gilmore, Dionne McCray.
Q. I am sorry?
A. Dionne, it's D-i-o-n-n-e, McCray. Garrin Wong.
Q. G-a-r-r-a-n?
A. -- i-n.
Q. Garrin?
A. Garrin Wong. That was -- when I first came on board, that's the people we had in those meetings. We eventually added more, but.
Q. Now, when you were hired, when you were first hired at PayPal, what was your position?
A. SQA automation manager.
Q. Right. Did you have a responsibility for a team or for subordinates?
A. A team, yeah.

Q. Did the team have a title within PayPal?

A. The automation team.

Q. Now, Mr. Gilmore -- Dionne Young, was that a woman?

A. Right.

Q. Dionne McCray?

A. Yes, it was.

Q. Mr. Gilmore and Dionne and Mr. Wong, were they managers of different teams?

A. Right.

Q. Who were your subordinates in 2003?

A. I had originally Demetrie Dorshenko and Steve Nelson and Scott Gersase. I eventually hired two more people, I can't remember their names. Sorry. But they moved into other groups after a while.

Q. Now, when you first started, do you recall the names of the two people that you hired?

A. I don't recall at this point.

Q. That's something that you might be able to recall?

A. Yeah.

Q. To get your memory refreshed, okay.

When you were first hired, do you recall what tasks you were asked to perform? Was there a particular -- let me rephrase that. Was there any

I DIANE L. FREEMAN, a Certified Shorthand Reporter, License No. 5884, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition, to wit, PAUL MONTGOMERY, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said transcript was taken down by me in shorthand at the time and place therein named and thereafter reduced to computerized transcription under my direction.

I further certify that I am not interested in the event of the action.

WITNESS my hand this 29th day of November, 2006.

Diane L. Freeman

DIANE L. FREEMAN, CSR #5884

# EXHIBIT F

## Giambanco, Sal

**From:** Bursese, Scott
**Sent:** Wednesday, February 26, 2003 11:20 AM
**To:** Giambanco, Sal
**Cc:** 'sbursese@sbcglobal.net'
**Subject:** advice on personnel issues

Hi Sal,

Thanks for being open and generous with your time.

I am experiencing both performance and personal issues with my direct report, Stephen Nelson. On numerous occasions I have brought the topic to the attention of my manager, Yuriy Brodskiy. While Yuriy will provide verbal assent that there is problem, he refuses to stop it.

After dealing with this both uncomfortable and unproductive work environment in our team, I escalated the issue to Cameron Bigger. Cameron, said that "it's been a known issue that there is a problem trying to control Stephen (Nelson)" After admitting that, Cameron said something to the affect that Yuriy will handle it. Cameron's involvement or lack of, again surfaced this past Saturday. I asked Stephen to get the laptop ready for the candidates for the jobfair. It was not made ready and Cameron asked why. I explained the situation and was under the impression that he and I would revisit the topic this week. Cameron has not responded to my emails requesting that he and I get together to "put the issues on the table."

One of the effects of maintaining the status quo is a handicapped team with unnecessarily inhibited productivity. i.e. Stephen will routinely change code in the base classes which breaks everyone else's code in the subclasses and more often than not will not tell anyone. When I ask Stephen why things are breaking I almost always receive a terse vituperative reply. These loud and emphatic outbursts destroy cohesion in our team and disrupt all those in the cubes around us. This problem among others, make it quite uncomfortable to perform one's duties.

I am at my wits end trying to determine an amicable way to resolve this situation. Can you recommend a way for me to seek resolution? I would be very grateful if you would keep this confidential until, we have had a chance to discuss it.

Thank You Very Much, for your time,

Scott Bursese

Borsese
EXHIBIT NO. 2
9-7-06
H. THUMAN, CSR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

SCOTT BURSESE,

Plaintiff,

vs. No. C 06-00636 RMW

PAYPAL, INC., a Delaware corporation,

Defendant.

_______________________________________/

DEPOSITION OF

SCOTT BURSESE

VOLUME 1; PAGES 1 - 229

THURSDAY, SEPTEMBER 7, 2006

CERTIFIED COPY

Reported By: HOLLY THUMAN, CSR No. 6834, RMR, CRR

(386008)

LEGALINK®
A MERRILL COMPANY

575 Market St
11th Floor
San Francisco, CA 94105
tel (415) 357-4300
tel (800) 869-9132
fax (415) 357-4301
www.merrillcorp.com
GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

--o0o--

APPEARANCES

GONZALEZ & LEIGH LLP, Two Shaw Alley, 3rd Floor, San Francisco, California 94105, represented by ENRIQUE PEARCE, Attorney at Law and G. WHITNEY LEIGH, Attorneyt at Law (present when indicated), appeared as counsel on behalf of the Plaintiff.

ORRICK, HERRINGTON & SUTCLIFFE LLP, The Orrick Building, 405 Howard Street, San Francisco, California 94105-2669, represented by GEORGE A. YUHAS, Attorney at Law and CHRISTIAN BROWN, Attorney at Law (present when indicated), appeared as counsel on behalf of the Defendant.

Also present was LAURIE CHAMBERS.

--o0o--

just myself.

Q. Now, that's a good point.

In your discussion with Mr. Giambanco, was the focus the problems that Stephen was giving to the department, or was it to both Stephen and others within your team?

In other words, was it limited to problems that Stephen was creating, or was it a broader discussion?

A. There were multiple discussions. And one occasion I remember Mr. Giambanco asked if there were any other issues other than the one that I brought up, which was Stephen.

I went down there to bring up one issue of an insubordinate employee that was causing issues. Mr. Giambanco asked if there were any other issues or if I had any problems with Cameron Bigger, the VP of engineering.

MR. YUHAS: Could you mark this as next?

(Exhibit 2 was marked.)

MR. YUHAS: Q. Mr. Bursese, Exhibit 2 is an email. It appears to be from yourself to Mr. Giambanco, dated February 26, 2003.

Is this in fact an email you sent to Mr. Giambanco?

A. It looks like an email I sent to Mr. Giambanco.

CERTIFICATE OF REPORTER

I, HOLLY THUMAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause; **that said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;**

That before completion of the deposition, review of the transcript [ ] was [X ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED September 13, 2006

HOLLY THUMAN, CSR No. 6834

# EXHIBIT G



PayPal
an eBay company

December 16th, 2003

Scott Burgese
4505 Hallowgate Lane
San Jose, CA 95124
(408) 265-5532

Dear Scott,

This letter sets forth the substance of the separation agreement (the "Agreement") that PayPal (the "Company") is offering to aid you with your employment transition.

1. **SEPARATION**. Your last day of active employment with the Company will be Friday, January 30th. (the "Separation Date"). The Company will pay you all accrued salary, subject to standard payroll deductions and withholdings, through the Separation Date. You will also be paid all accrued and unused vacation time earned through the Separation Date, subject to standard payroll deductions and withholdings. You are entitled to these payments regardless of whether you sign this Agreement.

2. **SEVERANCE**. Although the Company has no policy or procedure requiring payment of any severance benefits, the Company will make a severance payment to you in the form of a lump sum payment in the amount of $25,000.00, which is equivalent to 13 weeks of base pay, subject to standard deductions and withholdings and less any sums owing to the Company. You will receive this payment after the Separation Date.

3. **STOCK OPTIONS**. Pursuant to the terms of your stock option grant(s), vesting of your stock options will cease on the Separation Date and you will have ninety (90) days or three (3) months (depending on your option agreement) from that date to exercise any vested options.

4. **HEALTH INSURANCE**. As provided by the federal COBRA law and by the Company's current group health insurance policies, you will be eligible to continue your health insurance benefits for up to eighteen (18) months following the Separation Date and, later, to convert to an individual policy. You will be provided with a separate notice of your COBRA rights. You are entitled to COBRA insurance whether or not you sign this Agreement. If you elect continued coverage under COBRA, the Company will pay your COBRA premiums for six calendar months after the Separation Date as part of this Agreement. The Company's obligation to make these payments will cease immediately if you become eligible for other health insurance benefits at the expense of another employer. You agree to immediately provide the Company written notice of the availability of health insurance within that time period. Although you are entitled to COBRA insurance whether or not you sign this Agreement, if you want the Company to pay your COBRA premium(s) for the above-referenced time period, you must sign this Agreement.

5. **OTHER COMPENSATION OR BENEFITS**. You acknowledge that, except as expressly provided in this Agreement, you will not receive any additional compensation, severance or benefits after the Separation Date. You recognize and agree that your employment relationship with the Company is permanently and irrevocably severed and the Company has no obligation, contractual or otherwise, to hire, re-hire or re-employ you in the future.

EXHIBIT 3
Debra V. Helgeson
CSR No. 3189
Date 10-25-06
Witness: GIAMBARCO

303 Bryant Street
Mountain View, CA 94041
Tel 650.864.8000
Fax 650.864.8001

6. EXPENSE REIMBURSEMENTS. Within ten (10) days of the Separation Date, you will submit your final documented expense reimbursement statement reflecting any and all authorized business expenses you incurred through the Separation Date for which you seek reimbursement. The Company will reimburse you for such expenses pursuant to its regular business practice.

7. RETURN OF COMPANY PROPERTY. By the Separation Date, you will return to the Company all Company documents (and all copies thereof) and other Company property and materials in your possession, or your control, including, but not limited to, Company files, notes, memoranda, correspondence, lists, drawings, records, plans and forecasts, financial information, personnel information, customer and customer prospect information, sales and marketing information, product development and pricing information, specifications, computer-recorded information, tangible property, credit cards, entry cards, identification badges and keys; and any materials of any kind which contain or embody any proprietary or confidential material of the Company (and all reproductions thereof).

8. **PROPRIETARY INFORMATION OBLIGATIONS.** You acknowledge your continuing obligations under your Employee Information and Inventions Agreement (a copy of which is attached hereto as Exhibit A), which include but are not limited to the obligation to refrain from any unauthorized use or disclosure of any confidential or proprietary information of the Company. Failure to comply with this provision shall be a material breach of this Agreement.

9. **CONFIDENTIALITY**. The provisions of this Agreement will be held in strictest confidence by you and will not be publicized or disclosed in any manner whatsoever; provided, however, that: (a) you may disclose this Agreement to your immediate family; (b) you may disclose this Agreement in confidence to their respective attorneys, accountants, auditors, tax preparers, and financial advisors; and (c) you may disclose this Agreement insofar as such disclosure may be necessary to enforce its terms or as otherwise required by law. In particular, and without limitation, you agree not to disclose the terms of this Agreement to any current or former Company employee or contractor. Failure to comply with this provision shall be a material breach of this Agreement.

10. **NONDISPARAGEMENT**. You agree not to disparage the Company, or the Company's officers, directors, employees, shareholders and agents, affiliates and subsidiaries in any manner likely to be harmful to them or their business, business reputation or personal reputation; provided that will respond accurately and fully to any question, inquiry or request for information when required by legal process. Failure to comply with this provision shall be a material breach of this Agreement.

11. **RELEASE OF CLAIMS**. In consideration for the payments and other promises and undertakings contained in this Agreement to which you would not otherwise be entitled, and except as otherwise set forth in this Agreement, you release, acquit and forever discharge the Company, its parents and subsidiaries, and its and their respective officers, directors, agents, servants, employees, attorneys, shareholders, successors, assigns and affiliates, of and from any and all claims, liabilities, demands, charges, causes of action, costs, expenses, attorneys fees, damages, indemnities and obligations of every kind and nature, in law, equity, or otherwise, which you assert or could assert against the Company at common law or under any statute, rule, regulation, order or law, whether federal, state or local, on any ground whatsoever, known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way related to agreements, events, acts or conduct at any time prior to and including the date you sign this Agreement, including but not limited to: all such claims and demands directly or indirectly arising out of or in any way connected with your employment with the Company or the termination of that employment; claims or demands related to salary, bonuses, commissions, stock, stock options, or any other ownership interests in the Company, vacation or other time off pay, fringe benefits, expense reimbursements, severance pay, or any other

form of compensation; any and all causes of action, including but not limited to actions for breach of contract, express or implied, breach of the covenant of good faith and fair dealing, express or implied, wrongful termination in violation of public policy, all other claims for wrongful termination and constructive discharge, and all other tort claims, including, but not limited to, intentional or negligent infliction of emotional distress, invasion of privacy, negligence, negligent investigation, negligent hiring, supervision or retention, assault and battery, false imprisonment, defamation, intentional or negligent misrepresentation, fraud, and any and all claims arising under any federal, state or local law or statute, including, but not limited to, the California Fair Employment and Housing Act; Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Fair Labor Standards Act; the Employee Retirement and Income Security Act; the Americans with Disabilities Act, 42 U.S.C. § 1981; the Family and Medical Leave Act; the California Family Rights Act; the California Labor Code; the California Civil Code; the California Constitution; and any and all other laws and regulations relating to employment termination, employment discrimination, harassment or retaliation, claims for wages, hours, benefits, compensation, and any and all claims for attorneys' fees and costs, inasmuch as is permissible by law and by the respective governmental enforcement agencies for the above-listed laws.

12. RELEASE OF UNKNOWN CLAIMS. You acknowledge that you have read and understand Section 1542 of the California Civil Code, which reads as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor." **You hereby knowingly, intentionally, and expressly waive and relinquish all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to your release of any unknown or unsuspected claims you may have against the Company.**

13. MISCELLANEOUS. This Agreement, including all exhibits, constitutes the complete, final and exclusive embodiment of the entire agreement between you and the Company with regard to this subject matter. It is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties or representations, prior agreements and communications, whether oral or written, as to the specific subjects of this letter by and between you and the Company. This Agreement may not be modified or amended except in writing signed by both you and a duly authorized officer of the Company. This Agreement will bind the heirs, personal representatives, successors and assigns of both you and the Company, and inure to the benefit of both you and the Company, their heirs, successors and assigns. If any provision of this Agreement is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement and the provision in question will be modified by the court so as to be rendered enforceable. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right, nor shall any waiver by the Company of any breach of this Agreement be a waiver of any preceding or succeeding breach. This Agreement will be deemed to have been entered into and will be construed and enforced in accordance with the laws of the State of California as applied to contracts made and to be performed entirely within California.

You have three business days to consider this Agreement, although you may choose to voluntarily execute it earlier. Upon acceptance of this Agreement within the time specified, please sign below and return the executed original to me. Upon your signature below, this will become our binding agreement with respect to your separation from the Company and its terms merging and superceding in their entirety all other or prior agreements and communications, whether written or oral, by you and the Company as to the specific subjects of this Agreement.

PayPal

By: ______________________
Salvatore J. Giambanco
Vice President, HR & Administration

**I UNDERSTAND AND AGREE TO THE TERMS CONTAINED IN THIS AGREEMENT AND INTEND, BY MY SIGNATURE BELOW, TO BE LEGALLY BOUND BY THOSE TERMS. I AM SIGNING THIS RELEASE KNOWINGLY, WILLINGLY AND VOLUNTARILY IN EXCHANGE FOR THE SEVERANCE BENEFITS DESCRIBED ABOVE:**

______________________
**Scott Bursese**

**Date:** December 16, 2003



MILLER & HELGESON REPORTERS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

SCOTT BURSESE,

Plaintiff,

versus

PAYPAL, INC., a Delaware corporation, etc., et al.,

Defendant.

No. C 06 0636 RMW

DEPOSITION OF: SAL GIAMBANCO

TAKEN ON: October 25, 2006

NO. 11711

REPORTED BY: DEBRA V. HELGESON
CSR No. 3189, RPR

Los Angeles San Francisco
800.487.6278

DEPOSITION OF SAL GIAMBANCO,
taken on behalf of the Plaintiff at
Two Shaw Alley, Third Floor,
San Francisco, California, on Wednesday,
October 25, 2006, at 10:08 A.M.
before Debra V. Helgeson, CSR No. 3189, RPR.

APPEARANCES:

For Plaintiff:

GONZALEZ & LEIGH, LLP
BY: JUAN ENRIQUE PEARCE, ESQ.
Two Shaw Alley, Third Floor
San Francisco, California 94105
(415) 512-2000

For Defendant:

ORRICK, HERRINGTON & SUTCLIFFE
BY: GEORGE A. YUHAS, ESQ.
405 Howard Street
San Francisco, California 94105-2669
(415) 773-5446

14:06:41

BY MR. PEARCE:

Q Not a very well-formed question, I will admit.

Do you recall how long after that meeting

14:06:47

took place that Scott Bursese left PayPal as an employee?

MR. YUHAS: Physically or legally, I guess, is the question.

BY MR. PEARCE:

14:06:56

Q That he no longer was considered an employee by PayPal, yeah.

A So he was no longer considered an employee of PayPal on January 31st, 2004.

Q Let's take a look at -- at an agreement

14:07:16

dated December 16, 2003.

I would like to have this marked next in order.

(Plaintiff's Exhibit 3 was marked for identification and is attached hereto.)

14:07:18

BY MR. PEARCE:

Q Please go ahead and review this document, with as much -- take as much time as you would like and let me know when you are finished.

Okay. After taking a look at this

14:09:21

particular letter dated December 16, is this the

14:09:26 separation agreement that you presented to Mr. Bursese in Meeting No. 5?

A Yes.

Q Okay. And does the refresh your

14:09:37 recollection at all as to the date of the fifth meeting?

A No. I assume that the fifth meeting occurred around December 16th.

Q Okay. Do you recall writing this

14:10:01 separation agreement?

A I do not.

Q Okay. Did you write this separation agreement?

A No.

14:10:09 Q Do you know who did write the separation agreement?

A I believe it was my administrative assistant.

Q And do you remember going over each of the

14:10:22 provisions in the separation agreement with Scott Bursese at that meeting?

A Yes.

Q And can you tell me, is there a base separation agreement in terms of severance that is

14:10:39 offered by PayPal? In other words, is there an

I, DEBRA V. HELGESON, CSR 3189, certify:

That the foregoing deposition of ____________________________ was taken before me at the time and place therein set forth, at which time the witness declared under penalty of perjury to tell the truth;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and were reduced to a computerized transcript under my direction;

That this transcript is a true record of the testimony of the witness and of all objections and colloquy made at the time of the deposition.

I further certify that I am neither counsel for nor related to any party to said action nor interested in the outcome.

The certification of this transcript does not apply to any of the same by any means unless under the direct control and direction of the certifying deposition reporter.

IN WITNESS WHEREOF, I have subscribed my name this ______ day of ___________________, 2006.

[signature]

DEBRA V. HELGESON, CSR No. 3189, RPR

# EXHIBIT H

MATT GONZALEZ (SBN 153486)
G. WHITNEY LEIGH (SBN 153457)
BRYAN W. VERESCHAGIN (SBN 188608)
J. ENRIQUE PEARCE (SBN 236228)
GONZALEZ & LEIGH LLP
Two Shaw Alley, Third Floor
San Francisco, CA 94105
Telephone: (415) 512-2000
Facsimile: (415) 512-2001

Attorneys for Plaintiff
SCOTT BURSESE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

SCOTT BURSESE,

Plaintiff,

v.

PAYPAL, INC., a Delaware corporation,

Defendant.

Case No. C 06-00636 RMW

**PLAINTIFF BURSESE'S INITIAL DISCLOSURE**

Plaintiff Scott Bursese submits the following Initial Disclosure in compliance with Federal Rules of Civil Procedure, Rule 26. This disclosure is limited to those documents and witnesses plaintiff has presently identified to support his claims. Plaintiff reserves the right to supplement this disclosure upon the discovery of additional relevant information.

**A. Rule 26(a)(1)(A): The name of witnesses, and if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in pleadings, identified the subject of the information:**

1. Cameron Bigger
2. Dmitri Doroshenko
3. Yuriy Brodskiy
4. Sandy Cruze
5. Sal Giambanco

ENTERED

CALENDARED

6. Brian Gilmer

7. Clay Jackson

8. Paul Montgomery

9. Plaintiff incorporates by reference all witnesses identified in PayPal, Inc's FRCP 26(a)(a)(A) Initial Disclosure.

10. Addresses and telephone numbers of these individuals are unknown to Plaintiff at the present time.

**B. Rule 26(a)(1)(B): A copy of, or a description by category and location of, all documents, data compilations, intangible things in possession, custody, or control of the party relevant to the disputed facts alleged with particularity in the pleadings:**

Plaintiff possesses personal notes chronicling the treatment he received by defendant PayPal, Inc. Plaintiff possesses logs and copies of written correspondence and electronically-communicated correspondence with defendant PayPal, Inc. Plaintiff incorporates by reference all relevant documents and things identified in PayPal, Inc.'s FRCP 26(a)(1)(B) Initial Disclosure. To the extent such documents exist, Plaintiff will produce a copy of relevant documents, if requested, when a protective order is in place.

**C. Rule 26(a)(1)(C): A computation of category of damages claimed by the disclosing party, making available for inspection and copying under Rule 34, the documents or other evidentiary materials not privileged or protected from disclosure, on which such computation is based including materials bearing on the nature and extent of the injuries suffered.**

Plaintiff calculates damages as follows:

| | |
|---|---|
| Lost wages and benefits for management position = | $337,500 |
| Lost benefit of 20% manager bonus = | $67,500 |
| Lost benefit of Team bonus = | $13,500 |
| Value of lost stock options = | $1,283,250 |
| Wages and benefits doubled per 38 USC § 4323 = | $1,478,411 |
| TOTAL = | $3,180,161 |

This sum does not include a calculation for either punitive damages or attorneys fees, although both are available to Plaintiff pursuant to Cal. Civ. Code § 3294 and 38 USC §

4323(h)(2), respectively. To the extent such documents exist, Plaintiff will produce a copy of relevant documents, if requested, when a protective order is in place.

**D. Rule 26(a)(1)(D): For inspection and copying as under Rule 34, the insurance agreement under which any person carrying on a insurance business may be liable to reimburse for payments made to satisfy the judgment.**

Not Applicable to Plaintiff.

DATED: June 29, 2006

GONZALEZ & LEIGH, LLP

By: ______________________
G. WHITNEY LEIGH
JUAN ENRIQUE PEARCE
Attorneys for Plaintiff
SCOTT BURSESE

**PROOF OF SERVICE**

I, Cinthia Blat, declare that I am a citizen of the United States, and I am employed in San Francisco County, State of California. I am over the age of eighteen years and not a party to the within action; my business address is Gonzalez & Leigh, LLP, Two Shaw Alley, Third Floor, San Francisco, California 94105.

On June 29, 2006, I served the following document: PLAINTIFF SCOTT BURSESE'S INITIAL DISCLOSURE on the following parties in this action by placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

| George A. Yuhas, Esq.<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>405 Howard Street<br>San Francisco, CA 94105-2669<br>**Fax: (415) 773-5759**<br>*Atty for Def. PayPal, Inc.* |
|---|

[X] **[BY US MAIL, CCP § 1013a(3)]** I caused the foregoing document(s) to be enclosed in a sealed envelope, with first class postage fully paid, for delivery as indicated herein. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing and know that, in the ordinary course of Gonzalez & Leigh's business practice, the document(s) described above would be deposited with the United States Postal Service on that same day at San Francisco, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed to be invalid if the postal cancellation date, or postage meter date, is more than one day after the date of deposit for mailing set forth in this declaration.

[X] **[BY FACSIMILE, CCP § 1013(e)]** I caused the foregoing document(s) to be transmitted by facsimile to the office(s) of the addressee(s) indicated above at the facsimile number(s) listed for each addressee served. Upon completion of said facsimile transmission, the transmitting machine issued a transmission report showing that the transmission was complete and without error.

[ ] **[BY OVERNIGHT DELIVERY, CCP§ 1013(d)]** I caused delivery of the document(s) listed above to be effected by overnight mail, by placing true and correct copies in separate envelopes for each addressee shown above, with the name and address of the person served shown on the envelope, and by sealing the envelope and placing it for collection. Delivery fees were paid or provided for in accordance with the ordinary business practices of Gonzalez & Leigh LLP.

[ ] **[BY PERSONAL SERVICE, CCP § 1011(a)]** I caused the foregoing document(s) to be served by hand to the addressee(s) listed above, with the name and address of the person served shown on the envelope.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on June 29, 2006 at San Francisco, California.

Cinthia Blat



GONZALEZ & LEIGH LLP

# FACSIMILE TRANSMISSION

June 29, 2006

TO: George Yuhas, Esq.
FAX: (415) 773-5759

FROM: J. Enrique Pearce
TEL: (415) 512-2000
FAX: (415) 512-2001

NO. OF PAGES INCLUDING COVER: 5

MESSAGE: Please see attached.

---

This facsimile transmission may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient or an authorized agent with permission to receive such information for the recipient, please contact the sender by telephone immediately (415) 512-2000.

Two Shaw Alley
3rd Floor
San Francisco, CA
94105

TEL 415-512-2000
FAX 415-512-2001